UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Laurie Williams,

       Plaintiff,

      v.                           Civil Action No. 5:13-cv-180

Commissioner of Social Security,

       Defendant.

## **REPORT AND RECOMMENDATION**
### (Docs. 8, 11)

Plaintiff Laurie Williams brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits.  Pending before the Court are Williams's motion to reverse the Commissioner's decision (Doc. 8), and the Commissioner's motion to affirm the same (Doc. 11).  For the reasons stated below, I recommend that Williams's motion be DENIED, and the Commissioner's motion be GRANTED.

## **Background**

Williams was 41 years old on her alleged disability onset date of January 15, 2005.  She has a GED and experience working as a nurse's aide, a store cashier/clerk, a cook/waitress, and a factory worker.  She is unmarried and has no children.  (AR 444.)  She lives in a trailer with a friend.  (AR 1154.)

Williams suffers from degenerative disc disease, obesity, depression, and diabetes mellitus.  She reports that she seldom leaves her trailer; and her daily activities consist of watching television, talking on the phone, doing simple household chores, and walking her dog.  (AR 130–31, 134, 444, 1160–61, 1167.)  For approximately two years during the alleged disability period, Williams cared for her sister's two children, ages three and six.  (AR 444–45, 809, 1154–55.)  She also helped care for her mother while she underwent chemotherapy in Florida.  (AR 1093–94.)  In addition, Williams held several part-time jobs during the alleged disability period.  (AR 969, 977.)

Williams does not drive due to a criminal history including six DUIs.  (AR 443.) She attended alcohol counseling ("AA") until approximately 2007, and testified at the administrative hearing that she has not drank alcohol in approximately ten years.  (*Id.*; AR 1169.)  She also testified at the hearing that she quit smoking (AR 1159), but later admitted to having a cigarette that day because she was nervous (AR 1168).  During much of the alleged disability period, Williams smoked approximately one pack of cigarettes daily, against her doctors' advice.  (*See, e.g.*, AR 443, 908, 1029–30, 1110.)

In September 2008, Williams protectively filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB").  (AR 220–30, 276–79.)  In her disability application, she alleged that, beginning on January 15, 2005, she has been unable to work due to lower back pain and a sciatic nerve problem on the left side.  (AR 119.)  She stated that these conditions have prevented her from being able to lift, squat, or bend; walk distances; and climb stairs or ride in a car without pain.  (*Id.*) Williams's application was denied initially and on reconsideration, and she timely

requested an administrative hearing.  In June 2010, a hearing was conducted by

Administrative Law Judge ("ALJ") Edward G. Hoban.  (AR 173–89.)  Williams appeared

and testified, and was represented by counsel.  Williams's aunt and a vocational expert

("VE") also testified at the hearing.  In August 2010, the ALJ issued a decision finding

that Williams was not disabled from her alleged onset date through the date of the

decision.  (AR 38–46.)  The Decision Review Board affirmed that decision, and Williams

subsequently appealed her claim to this Court.  In March 2011, upon the Commissioner's

unopposed motion for remand under sentence four of 42 U.S.C. § 405(g), the Court

remanded the claim to the Commissioner for further administrative proceedings and a

new decision.  (AR 56–57.)

Meanwhile, in February 2011, Williams filed second applications for SSI and

DIB, alleging disability as of August 27, 2010.  (AR 237–38, 244–55.)  These

applications were also denied initially and on reconsideration.  In March 2012, based on

the Court's March 2011 remand order, the Appeals Council remanded Williams's

original claim to the ALJ with instructions regarding further proceedings and a new

decision.  (AR 58–63.)  The Council also determined that the February 2011 claim

duplicated the original claim, and thus the ALJ was ordered to "associate" the two claims.

(AR 62.)  On December 4, 2012, a second administrative hearing was held by ALJ

Hoban.  (AR 1148–1204.)  Williams again appeared and testified, and was represented by

counsel.  A VE also testified at the hearing.  On February 22, 2013, the ALJ issued a

partially favorable decision finding that Williams became disabled on February 3, 2013,

the date her age category changed, but was not disabled prior to that date.  (AR 17–28.)

**ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

4

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, in his February 2013 decision, ALJ Hoban

first determined that Williams had not engaged in substantial gainful activity since her

alleged disability onset date of January 15, 2005.  (AR 19.)  At step two, the ALJ found

that Williams had the severe impairments of a back disorder and obesity.  (*Id.*)

Conversely, the ALJ found that Williams's depression, gastroesophageal reflux disease,

urinary incontinence, asthma, and diabetes with lower extremity neuropathy were non-

severe.  (AR 20–21.)  At step three, the ALJ found that none of Williams's impairments,

alone or in combination, met or medically equaled a listed impairment.  (AR 21.)  Next,

the ALJ determined that Williams had the RFC to perform a range of sedentary-to-light

work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Williams] can stand, walk, and sit for at least 8 hours during an 8-hour
> workday.  [She] can frequently climb stairs, balance[,] kneel, and crawl.
> She can occasionally climb ladders, stoop, and crouch.  She requires a
> sit/stand option for at least 30-minute intervals during the day.

(AR 22.)

Given this RFC, the ALJ found that Williams was unable to perform her past

relevant work as a nurse assistant, a sales clerk, a waitress, a tube-sizer/cutter, a short-

order cook, and a home attendant.  (AR 25.)  The ALJ then determined that, prior to the

alleged disability onset date, Williams was a younger individual (age 18–49), but on

February 3, 2013, her age category changed to "an individual closely approaching advanced age."  (*Id.*)  At step five, based on testimony from the VE, the ALJ determined that, prior to February 3, 2013, Williams could perform other jobs existing in significant numbers in the national economy, including the jobs of silver wrapper, telephone solicitor, and answering-service worker.  (AR 26.)  The ALJ concluded that, prior to February 3, 2013, Williams had not been under a disability, but on that date, she became disabled and continued to be disabled through the date of the decision.  (AR 27.)  Williams did not file exceptions to the ALJ's decision, and thus it became final after 60 days.  On June 24, 2013, Williams filed the Complaint initiating this action.  (Doc. 3.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal

standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

**I.    Substantial Evidence Supports the ALJ's Determination that Williams's Impairments Do Not Meet or Equal a Listed Impairment.**

Williams argues that the ALJ erred in finding that her back impairment did not meet the requirements of Listing 1.04, the listing for spine disorders. The Listings are regulatory descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990) (citing 20 C.F.R. pt. 404, subpt. P, app. 1 (pt. A) (1989)). Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. *Id.* at 530. For a claimant to show that his or her impairment matches a

listing, the impairment must meet "*all* of the specified medical criteria" of that listing.  *Id.*
"An impairment that manifests only some of those criteria, no matter how severely, does
not qualify."  *Id.*  Likewise, for a claimant to qualify for benefits by showing that his or
her unlisted impairment, or combination of impairments, is "equivalent" to a listed
impairment, he or she must present medical findings equal in severity to "*all* the criteria
for the one most similar listed impairment."  *Id.* at 531.  The Social Security
Administration has explained that a determination regarding whether a claimant's
impairment or combination of impairments is medically the equivalent of a listed
impairment "must be based on medical evidence demonstrated by medically acceptable
clinical and laboratory diagnostic techniques, including consideration of a medical
judgment about medical equivalence furnished by one or more physicians designated by
the Secretary."  SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds
by* SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

For a claimant to meet or equal the severity of Listing 1.04, he or she must suffer
from:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in compromise of a nerve root
> (including the cauda equina) or the spinal cord.  With:
>
> A. Evidence of *nerve root compression* characterized by neuro-
> anatomic distribution of pain, limitation of motion of the spine, motor loss
> (atrophy with associated muscle weakness or muscle weakness)
> accompanied by sensory or reflex loss and, if there is involvement of the
> lower back, positive straight-leg raising test (sitting and supine);
>
> or

B. *Spinal arachnoiditis*, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. *Lumbar spinal stenosis resulting in pseudoclaudication*, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and *resulting in inability to ambulate effectively*, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04 (emphases added). "Inability to ambulate effectively" is defined in the Listings as follows:

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having *insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities*.

*Id.* at § 1.00(B)(2)(b)(1) (emphasis added).

The ALJ found that Williams did not meet Listing 1.04 because the record contains no medical evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication (intermittent limping). (AR 21.) The ALJ explained that Williams exhibited a negative straight-leg raise and a normal gait, and her imaging reveals none of the required pathology. (*Id.*) Substantial evidence supports these findings and reveals that Williams walked with a normal gait, had full strength in her lower extremities, and had little-to-no difficulty walking on her heels and toes during most of the alleged disability period. (*See, e.g.*, AR 611, 910, 1039, 1105, 1110, 1135, 1139.)

9

Williams cites to an August 2010 MRI showing lateral stenosis to demonstrate that she has met the criteria of Listing 1.04(C).  (Doc. 8 at 7 (citing AR 1037).)  The MRI does not demonstrate, however, that the stenosis resulted in pseudoclaudication[1], which is required under the Listing.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04(C).  Williams asserts that treating physician Dr. Michael Kenosh stated in a treatment note that Williams's clinical symptoms "'sound consistent with neurogenic claudication[2],'" which Williams states is synonymous with pseudoclaudication.  (Doc. 8 at 8 (quoting AR 1033).)  This speculative statement by Dr. Kenosh is far from a "finding[] on appropriate medically acceptable imaging," required to meet the criteria of Listing 1.04(C).  20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04(C).  Moreover, Dr. Kenosh ultimately opined, as discussed in detail below, that Williams maintained a capacity to do full-time work despite her physical impairments including difficulty walking.  (AR 419, 713.)  Furthermore, there is no evidence that Williams's neurogenic claudication, if it existed, resulted in Williams's complete "inability to ambulate effectively," as defined in the regulations, also required to meet the criteria of Listing 1.04(C).  20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04(C); *see id.* at § 1.00(B)(2)(b)(1).  Williams argues that the opinion of treating physician Dr. William Barrett, also discussed in detail below, "provides evidence of a failure to ambulate effectively."  (Doc. 8 at 9 (citing AR 634, 1135).)  But the

---

[1]  "Pseudoclaudication" results from a disorder in the spine, and is marked by symptoms similar to those of intermittent claudication, a condition caused by ischemia of the muscles and characterized by attacks of lameness and pain brought on by walking.  *See* 4-P *Attorneys' Dictionary of Medicine* § P-96664 (2009); *Stedman's Medical Dictionary* 389 (28th ed. 2006).

[2]  "Neurogenic claudication" is defined as intermittent limping with neurologic injury, usually in association with lumbar spinal stenosis.  *Stedman's Medical Dictionary* 389 (28th ed. 2006).

opinion of a treating physician, if inconsistent with other substantial evidence, is insufficient to demonstrate that a claimant meets the criteria of a particular listing. *See, e.g.*, *Steagall v. Comm'r of Soc. Sec.*, No. 1:07cv961, 2009 WL 806634, at *5 (S.D. Ohio Mar. 25, 2009) (treating physician opinion that claimant met Listing found insufficient to satisfy criteria of that Listing because opinion was inconsistent with other substantial evidence); *Southard v. Astrue*, No. 3:07-cv-90, 2008 WL 3911157, at *9 (D. N.D. Aug. 19, 2008) (where treating physician opinion was not supported by objective medical findings and merely relied on claimant's subjective complaints, it was insufficient to satisfy criteria of listing); *Guess v. Shalala*, No. CA-91-122-VAL, 1993 WL 473201, at *3 (M.D. Ga. June 14, 1993) ("a mere opinion by a physician that a claimant's impairment meets a listing is insufficient.  The claimant must provide proof that he . . . [has] a diagnosed condition that is included in the listings and . . . [must] provid[e] reports that show he meets the specific tests listed under it.")

## II.     The ALJ Did Not Err in His Analysis of the Medical Opinions.

Next, Williams claims the ALJ erred in his analysis of the medical opinions. Specifically, Williams asserts that the ALJ should not have relied on the opinions of treating physician Dr. Kenosh and the agency consultants over those of treating physician Dr. Barrett.  In response, the Commissioner argues that the ALJ's analysis of the medical opinions complies with the applicable legal standards and is supported by substantial evidence.

Dr. Kenosh, a physical medicine and rehabilitation specialist, treated Williams's back pain from approximately January through November 2007 and then again starting in

June 2010.  In April 2007, Dr. Kenosh opined that Williams had the capacity for medium work but recommended alternating sitting and standing when she was uncomfortable. (AR 713.)  Approximately 17 months later, in November 2008, Dr. Kenosh opined that Williams was capable of "a light to medium duty of work," but added that she may be required to change positions between sitting and standing every 30-to-60 minutes.  (AR 419.)  The ALJ afforded "substantial weight" to Dr. Kenosh's opinions, finding that they "are generally consistent with the totality of the objective medical findings" and Williams's "reported activities of daily living."  (AR 24.)  The ALJ also gave "substantial weight" to the agency medical consultant opinions, which are similar to those of Dr. Kenosh, finding that they are generally consistent with Dr. Kenosh's opinions.  (*Id.*)

Dr. Barrett, a family medicine provider, also treated Williams's back pain during the alleged disability period.  His opinions about Williams's functional capacity are significantly different than those of Dr. Kenosh and the agency consultants.  In July 2009, Dr. Barrett opined that, since January 2005, Williams could sit for only two-to-three hours and stand/walk for only one hour in an eight-hour workday, would need to lie down for five minutes every two hours in an eight-hour workday, could not walk one block at a reasonable pace over rough and uneven surfaces, could not climb a few steps at a reasonable pace with the use of a single handrail, and required assistance to carry bags. (AR 631–32, 634.)  Stating that Williams's "[c]hronic fatigue, poor sleep[,] and obesity all combine to make working [eight] hours without special accommodations impossible," Dr. Barrett concluded that Williams would miss more than four days of work per month due to her impairments.  (AR 634.)  Years later, in November 2012, Dr. Barrett made the

12

same opinions.  (AR 1145.)  The ALJ afforded "very little weight" to Dr. Barrett's

opinions on the grounds that they are "highly inconsistent" with the medical evidence,

Williams's reported activities of daily living, and the opinions of Dr. Kenosh and the

agency medical consultants.  (AR 25.)

I find no error in the ALJ's analysis of the medical opinions of Drs. Kenosh and

Barrett.  It was clearly legally proper for the ALJ to consider whether these opinions are

consistent with the record, including the objective medical evidence, the other medical

opinions, and Williams's daily activities.  *See* 20 C.F.R. § 404.1527(c)(4) ("the more

consistent an opinion is with the record as a whole, the more weight we will give to that

opinion").  Moreover, substantial evidence supports the ALJ's findings that Dr. Kenosh's

opinions are consistent with the record and Dr. Barrett's are not.

Dr. Kenosh's own treatment notes reveal that Williams had a normal gait, full

strength and stability, and intact sensation to touch; and showed improvement with

steroid injections and exercise.  (*See, e.g.*, AR 415, 509, 511–12, 515, 771–73, 778, 1029,

1031.)  In general, Dr. Kenosh's treatment notes reveal a conservative treatment plan,

including regular exercise, based on unremarkable examination findings.  For example, in

a January 2007 treatment note, Dr. Kenosh stated that, based on her normal examination,

he did not view Williams as a surgical candidate (AR 515), but rather considered exercise

to be "the primary goal for management" of her symptoms (AR 516).  A few months

later, in a May 2007 treatment note, Dr. Kenosh recorded: "I stressed again the

importance of aerobic exercise for [Williams]," and advised her that "I would not restart

physical therapy until she [wa]s compliant with an aerobic exercise program" such as

13

"walking [for] 40 minutes four times a week at a brisk pace." (AR 415–16.) Dr. Kenosh noted that Williams felt she did not require another epidural steroid injection at that time. (AR 416.) Approximately three years later, in a June 2010 treatment note, Dr. Kenosh referred to Williams's statement that she "felt like a 'spring chicken'" in approximately October 2007 after he had performed epidural steroid injections on her (AR 771), and recorded normal examination findings other than depressed mood (AR 773) and self-reported "pain rated as a 6/10 on a visual analogue scale" (AR 772). A few months later, in a detailed August 2010 treatment note, Dr. Kenosh's physician's assistant ("PA"), William Zuber, PA-C, observed that Williams walked with a "normal-appearing gait pattern, without lower-extremity weakness," denied having significant problems when she attempted to walk on her toes and heels, had "no significant abnormalities of [the] spinal curvature," had no "tenderness through her back or trunk," negative straight-leg raising, and "generally ha[d] normal strength throughout [the] muscle groups of both lower extremities as well as intact sensation to light touch." (AR 778.) PA Zuber stated: "While I did spend the majority of our 35-minute visit with [Williams] discussing potential benefits of regular brisk aerobic activity, core strengthening, weight loss, and smoking cessation in regards to her back problems and for her health in general, she still would very much like to follow through with a repeat injection . . . ." (AR 778–79.)

A January 2007 treatment note of another examining physician, Dr. Alan Covey, indicates that, other than moving slowly and exhibiting some discomfort in her back, Williams had a normal examination, including good strength and no radicular pain. (AR 809.) Dr. Covey would not prescribe narcotic medication for Williams, and

recommended applying heat to her back.  (AR 810.)  Dr. Barrett's treatment notes make

substantially the same objective findings as those of Dr. Kenosh, PA Zuber, and Dr.

Covey, while also documenting Williams's back pain.  For example, in an October 2009

treatment note, Dr. Barrett indicated that, although Williams was tender in her back and

buttocks, she had a normal gait and station and no decreased range of motion or

instability.  (AR 909–10.)  Like Dr. Kenosh and PA Zuber, Dr. Barrett "[s]tressed the

importance of regular exercise" to Williams.  (AR 911.)  In a September 2010 treatment

note, Dr. Barrett recorded that Williams was "[w]ell appearing, well nourished[, and] in

no distress"; and demonstrated a "[n]ormal gait and station, [normal] muscle strength and

tone in upper and lower extremities[,]" and "[n]o abnormal movements."  (AR 1105.)  In

December 2010, Dr. Barrett noted that Williams "generally appear[ed] well" and had

started a new temporary job in another town.  (AR 969.)  In December 2011, Dr. Barrett

noted that Williams appeared normal except obese and walking with a limp, and stated

that Williams was "leaving for Florida . . . to help with mother and father" because her

mother was starting chemotherapy for colon cancer.  (AR 1093.)  On examination, Dr.

Barrett again recorded that Williams demonstrated a normal gait and station, normal

muscle strength and tone in upper and lower extremities, and no abnormal movements.

(*Id.*)  Dr. Barrett advised Williams to "perform activities that do not exacerbate pain,

[apply a] warm compresses to [the] affected area, [and] . . . perform range of motion

exercises."  (AR 1094.)  These treatment notes do not support Dr. Barrett's opinions that

Williams was unable to do even sedentary work prior to February 2013.

Williams claims the ALJ should not have given more weight to Dr. Kenosh's opinions than to Dr. Barrett's because Dr. Barrett had a longer treatment relationship with Williams and had seen her more recently than Dr. Kenosh. (Doc. 8 at 13.) Along the same lines, Williams asserts that the ALJ should not have relied on the agency consultant opinions because they did not consider either the treating source statements or any evidence dated after January 2009. (*Id.* at 15.) Generally, in cases where it is unclear whether the consulting physicians reviewed all of the claimant's relevant medical information, these opinions will not override those of the treating physicians. *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011). But where the consultant opinions are supported by the record and there is no evidence of a new diagnosis or a worsening of the claimant's condition after the consultant opinions were made, the ALJ may rely on them. *See Charbonneau v. Astrue*, No. 2:11-CV-9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012).

Here, the consultant opinions are supported by the opinions of treating physician Dr. Kenosh. (*Compare* AR 419, 713 *with* AR 434–41, 714–21, 730–37.) And although, as the ALJ acknowledged, Dr. Kenosh's opinions were made "well before the close of the [alleged disability] period," the ALJ correctly found that "there is nothing in the record to suggest any substantial worsening [of Williams's condition] after 2008." (AR 24.) Williams contends that an August 2010 MRI is "substantially worse" than the earlier MRIs reviewed by Dr. Kenosh and the agency consultants (Doc. 8 at 15), presumably reflecting a substantial worsening of Williams's condition prior to that date. But Williams points to no medical report summarizing the August 2010 MRI or opining that

it indicated either a severely limiting condition or a worsening of Williams's condition.[3]

This Court, not being medically trained or educated, is just as ill-equipped to interpret and compare MRI reports as the Commissioner and the claimant are. *See Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) ("Neither a reviewing judge nor the Commissioner is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion, or indeed for any competent medical opinion.") (internal quotation marks and citations omitted); *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings .") (citing *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("because an [ALJ] . . . is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony")). Furthermore, Dr. Barrett did not cite the August 2010 MRI in his opinions. (*See* AR 630–34, 1141–45.) Also noteworthy, Dr. Barrett's 2012 opinions are virtually word-for-word the same as his 2009 opinions, indicating that he did not believe Williams's condition worsened between 2009 and 2012. (*Id.*) This aligns with the post-2009 record evidence in general, including Dr. Kenosh's and Dr. Barrett's treatment notes (summarized above) as well as Williams's daily activities, which do not reflect a significant worsening of Williams's condition post-January 2009.

---

[3]  The August 2010 MRI itself merely states that "[t]he asymmetric disc bulging to the left at L4-L5 is *slightly more* prominent than on the study of 09/04/2007." (AR 1037 (emphasis added).)

Williams also argues that the ALJ should have valued Dr. Barrett's opinions more heavily than Dr. Kenosh's because only Dr. Barrett "specifically included the exacerbating effects of [Williams's] obesity" in his opinions.  (Doc. 8 at 14 (citing AR 634); *see also* Doc. 12 at 3.)  But in fact, in his November 2008 opinion, Dr. Kenosh considered Williams's obesity, stating: "[Williams] has a history of depression, anxiety, *obesity*, alcohol abuse, and diabetes mellitus."  (AR 419 (emphasis added).)  Moreover, in his treatment notes, Dr. Kenosh repeatedly listed obesity as one of Williams's medical complaints, and attempted to treat that condition, as well as her back pain, with a regular exercise program.  (*See, e.g.*, AR 412, 415, 514–16, 1029–30.)  Thus it can be inferred that Dr. Kenosh took into account Williams's obesity in making his opinions regarding Williams's functionality.  More importantly, the ALJ himself found Williams's obesity to be a severe impairment and explicitly noted the condition throughout his decision.  (*See* AR 19–22.)  Williams has failed to demonstrate error in either Dr. Kenosh's or the ALJ's consideration of Williams's obesity.

For these reasons, I find that the ALJ's analysis of the medical opinions was proper.  The ALJ correctly applied the regulatory factors and "gave good reasons," including consistency with the record as a whole, for crediting the opinions of Dr. Kenosh over those of Dr. Barrett.  20 C.F.R. § 404.1527(c); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  Contrary to Williams's contention (*see* Doc. 12 at 3), in analyzing a treating physician's opinion, the Second Circuit does not require "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation[s] are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see*

*Halloran*, 362 F.3d at 32 (affirming ALJ opinion even though it was unclear whether ALJ considered or was aware of applicability of the treating physician rule, because "substance of the treating physician rule was not traversed").

### III.    The ALJ Did Not Err in His Assessment of Williams's Credibility.

Next, Williams contends the ALJ erred in finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms are "not entirely credible." (AR 23.) It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints, even if substantial evidence supporting the claimant's position also exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *id.* at 127 ("Though [claimant's] position was . . . supported by the opinion of Dr. Holloman . . ., the ALJ was not compelled to credit that testimony over the testimony of Drs. Chiaramonte and Budow and the records of Dr. Friedman.").

Here, in assessing Williams's credibility, the ALJ properly considered the medical evidence as well as Williams's daily activities and work activity. *See* 20 C.F.R. § 404.1529(c)(3) (listing factors considered in evaluating the intensity and persistence of claimant's symptoms, including daily activities, medication and other treatment received, and measures taken to relieve pain). Specifically, the ALJ considered that treatment notes documented normal gait, full strength, and normal sensation during the alleged

disability period.  Regarding Williams's testimony about her pain at the administrative

hearing, the ALJ stated:

> [Williams's] testimony regarding her pain and describing occasions where
> she had to lie down on a couch for three or four days caused by bending
> over is not consistent with the documentary evidence of record; this
> evidence does not include any references to these incidents even in
> hindsight.  [Williams] has described falls in which she has injured her
> shoulder or ankle, but no incidents in which she was incapacitated for days
> by back pain.  The record does show that pain lessened following a series
> of injections.  In November 2007, [Williams] reported feeling like a "spring
> chicken" and had much better functional tolerance.  She was not taking any
> back pain medication at that time.  Such evidence tends to call into question
> the severity of [Williams's] alleged impairments.

(AR 23 (citations omitted).)  Substantial evidence, including the treatment notes

discussed earlier, supports these findings.  (*See, e.g.*, AR 773, 778–79, 1105, 1110.)

Regarding Williams's reported daily activities, as the ALJ noted, the record

reflects that Williams was able to handle her own personal needs, perform light

housework, care for her sister's two children, travel to Florida to care for her ailing

mother, and work on a part-time basis[4] during the alleged disability period.  (AR 23–24,

281–82, 444–45, 514, 809, 969, 977, 1093, 1154–55.)  The ALJ's consideration of these

reported daily activities, including in particular Williams's ability to work on a part-time

basis, was proper.  *See, e.g.*, *Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009)

("in assessing the credibility of a claimant's statements, an ALJ must consider . . . the

claimant's daily activities"); SSR 96-7p,1996 WL 374186, at *5–6 (July 2, 1996); 20

C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity,

---

[4]  In a March 2011 treatment note, Dr. Barrett stated that Williams was "forced to quit work 2–3
mo[nths] ago, as the bending and lifting loading boxes aggravated her pain" (AR 977), demonstrating that
not only was Williams working during the alleged disability period, but she was doing a job that required
bending and lifting boxes, an activity she claims to have been unable to do since 2005.

it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled.").

Accordingly, I find that the ALJ properly gave specific reasons for his adverse credibility finding, and those reasons are supported by substantial evidence in the record.

## IV.    Substantial Evidence Supports the ALJ's Reliance on the VE's Testimony at Step Five.

Williams next claims that the ALJ should not have relied on the VE's testimony regarding the jobs Williams could do because those jobs involve semi-skilled work and the ALJ determined that Williams could do only unskilled work.  (Doc. 8 at 10.)  The argument fails because the ALJ did not limit Williams to unskilled work, and the evidence does not support such a limitation.  Rather, when questioning the VE at the administrative hearing, the ALJ included in the relevant hypothetical Williams's past relevant work, which the VE described as "semi-skilled."  (AR 1175–76.)

In her Reply, Williams argues that Social Security Ruling ("SSR") 82-41 required the ALJ to make findings of fact regarding the transferability of skills in this case. However, that Ruling states as follows, in relevant part: "*When the issue of skills and their transferability must be decided*, the . . . ALJ is required to make certain findings of fact and include them in the written decision."  SSR 82-41, 1982 WL 31389, at *7 (1982) (emphasis added).  In this case, the issue of skills and their transferability did not need to be decided, as the ALJ properly stated: "Prior to February 3, 2013, *transferability of job skills is not material to the determination of disability* because using . . . Medical-

Vocational Rules [202.21 and 201.21] as a framework supports a finding that [Williams] is 'not disabled' whether or not [she] has transferable job skills."  (AR 26 (emphasis added).)  In other words, as a "younger individual age 18–49" (AR 25), capable of sedentary or light work, having at least a high school education and past work experience (AR 25–26), a finding of "not disabled" would apply under the Medical-Vocational Rules ("the Guidelines"), regardless of whether Williams's past work was unskilled, semi-skilled, or skilled, and regardless of whether those skills were transferable.  *See* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.21-.22, 202.21-.22.[5]  In any event, the ALJ explicitly did not rely on any directed decision of "not disabled" in the Guidelines for the period prior to February 3, 2013.  Rather, the ALJ recognized that, because Williams had additional limitations, the Guidelines did not direct a conclusion of disabled or not disabled but instead provided a framework to support a decision.  (*See* AR 26 ("[Williams's] ability to perform all or substantially all of the requirements of the light and sedentary level of work was impeded by additional limitations.").)  Thus, the ALJ was not required to make specific findings regarding transferability of skills.

Furthermore, even assuming Williams could do only unskilled work, remand is not required because the ALJ found, based on the VE's testimony, that Williams could do the silver wrapper job (AR 26), which the VE testified is an "unskilled, level 1" job (AR 1176).  Williams fails to effectively challenge the ALJ's decision regarding this job; and

---

[5]  On the other hand, the ALJ determined that, beginning on February 3, 2013, Williams "has not been able to transfer job skills to other occupations" (AR 26), and thus, applying Rule 201.14 as a framework, the ALJ found that there were no jobs existing in significant numbers in the national economy that Williams could perform beginning on that date (AR 27).  *See* 20 C.F.R. pt. 404, subpt. P, app. 2 § 201.14.

the regulations require that a significant number of jobs exist in only "one or more occupations."  20 C.F.R. § 404.1566(b).  Therefore, even if Williams was able to do only one of the three jobs which the ALJ determined existed in significant numbers in the national economy, a finding of not disabled would be appropriate.  *See Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30, 2008) ("even the finding that one job exists in sufficient numbers in the national economy capable of being performed by the plaintiff is sufficient to sustain the Commissioner's burden at step five").

Williams further contends that the VE's testimony regarding the number of jobs available in the Department of Labor's Dictionary of Occupational Titles ("DOT") was flawed because the VE did not reduce the number of jobs on the Bureau of Labor and Statistics ("BLS") website to account for Williams's DOT occupations.[6]  (Doc. 8 at 11–12.)  The VE testified that she "use[s] the [BLS] numbers to give the numbers of jobs" and that she refers to the BLS website to get these numbers.  (AR 1197–98.)  The VE explained that the BLS uses Occupational Employment Survey ("OES") numbers rather than DOT numbers.  (AR 1198.)  I find no error in the VE's reliance on OES numbers instead of DOT numbers.

The Second Circuit has recently held that it is sufficient that a VE "'identified the sources he generally consulted to determine [the job numbers],'" noting "the marked absence of any 'applicable regulation or decision of th[e] Court requiring a vocational

---

[6] Although Williams appears to have abandoned this argument in her Reply (*see* Doc. 12 at 7–8), she does not explicitly say so.  Thus it is briefly addressed, and rejected, here.

expert to identify with greater specificity the source of his figures or to provide supporting documentation.'" *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 450 (2d Cir. 2012) (quoting *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008)).  Here, the VE properly identified the sources she consulted to determine her job numbers.[7]  This testimony, coupled with the VE's expertise and experience, constitutes sufficiently reliable evidence at step five of the ALJ's sequential evaluation.  *See Brault*, 683 F.3d at 448 (reconfirming "flexible" substantial evidence approach to disability proceedings, and holding that ALJ was not required to state reasons for accepting VE's testimony, which claimant challenged on grounds that VE's methodology did not reliably match the job types in the DOT with other data showing employment numbers).  In any event, Williams concedes that the telephone solicitor position was an OES category with only one DOT code, thus requiring no reduction of the OES numbers.  (Doc. 8 at 12.)  Thus, even assuming the ALJ erred regarding the other two jobs, he satisfied his burden at step five by identifying one job consistent with Williams's RFC existing in significant numbers in the national economy.  *Martin*, 2008 WL 4793717, at *12.

Finally, in her Reply, for the first time, Williams asserts that the VE's testimony about the telephone solicitor job was improper.  In relevant part, the VE testified that she was not able to estimate how many of these jobs she had "actually observed or placed people in."  (AR 1191.)  In response to Williams's attorney's questioning on the topic, the VE stated: "I couldn't really answer that.  I don't know. . . .  I'm not even sure what

---

[7]  The ALJ explained his reliance on the VE's expertise in his decision, stating: "The [VE] made clear that any testimony that differed from the [DOT] was based on her very extensive knowledge, training, and experience. . . .  I find that the [VE] was well qualified to offer expert testimony and accept[] such testimony as reliable and credible."  (AR 27.)

you're asking. . . .  I don't keep statistics on that.  What I could tell you is that any time I had someone that was looking for such a job, it would be modifiable."  (AR 1190–91.) Earlier, the VE testified about her general approach to making opinions regarding jobs claimants can do: "I look at the jobs based on my vocational experience, and that's how I evaluate them, along with the DOT definition."  (AR 1187.)  Williams asserts that the VE was required to provide specific numbers regarding telephone solicitor jobs that would allow a sit/stand option.  (Doc. 12 at 8.)  But she cites no law supporting this argument, and I am aware of none.  Rather, the case law cited above (*see Brault*, 683 F.3d 443; *Galiotti*, 266 F. App'x 66), as well as SSR 00-4p, specifically allows VEs to rely on their own professional experience where the DOT does not apply.  *See* SSR 00-4p, 2000 WL 1898704, at *2–3 (Dec. 4, 2000); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony.").

In sum, the ALJ was permitted to base his step-five findings on the VE's testimony, which was founded on the VE's experience and expertise; and the ALJ was not required to seek more explanation than was provided at the administrative hearing. Furthermore, as discussed above, the ALJ's hypothetical to the VE accurately characterizes Williams's limitations and is consistent with the medical evidence and opinions.  Therefore, I do not find that the ALJ erred in his step-five determination.

## Conclusion

For these reasons, I recommend that Williams's motion (Doc. 8) be DENIED, the Commissioner's motion (Doc. 11) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 31st day of March, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).